SAMUEL PANCOAST and JOSHUA BULLOCK, executors, &c., appellants, *vs.* ELLEN GRAHAM and others, respondents.

Where a *caveat* is filed against proving a will by a person who claims to be attorney in fact for legatees under a former will, who, if living at all, live in a distant state of the Union, and no power of attorney is produced from such legatees—*held* that the fair presumption was, under the circumstances of this case, that no power of attorney was in existence, and that it was the duty of those opposing this will on behalf of such legatees to give some evidence of their being still alive, and of the authority to appear for them, if they wish to attack the present will because of their not being mentioned in or provided for in it.

The evidence in this case carefully examined, and the will admitted to pro-

bate against a very strong array of medical and other testimony against the sanity of the testator.

The testimony of the attesting witnesses, as to the sanity of testator, held to be strengthened by the facts that the will is a reasonable one on the face of it, and that its contents correspond with the repeated declarations of the testator.

The consideration is entitled to some weight, that by the will under consideration the property is mostly given to the heirs-at-law and next of kin of the testator, who are satisfied with the will as it stands. The caveators, if they claim as devisees or legatees under a former will, should have propounded it for probate. Not having done this, the presumption is that, if this will is not established, the decedent died intestate, and such being the case, the property would go to the very persons to whom it is given by the present will, and the caveators would derive no benefit from defeating it.

*Mahlon H. Hutchinson, John L. Stratton,* and *W. L. Dayton,* for appellants.

*Garrit S. Cannon* and *John C. Ten Eyck,* for respondents.

THE ORDINARY. The appellants, who are the executors named in a paper writing which purports to be the last will of Lewis W. Pancoast, late of the county of Burlington, deceased, offered the same for probate to the surrogate of that county. The respondents, who claim to be interested in the estate of the deceased as legatees under an alleged prior will of the decedent, filed a *caveat.* A large number of witnesses were sworn and examined in favor of and against the will, and the court decided against admitting it to probate. The objections urged against the will are two—the mental incapacity of the testator, and that the will was procured by undue influence. It was on the ground of incapacity that the Orphans Court rejected the will. There is no evidence in the case to justify a reasonable suspicion that the will was procured by undue influence. I shall not therefore further notice this objection, but will direct my inquiry to the other ground of objection, the incapacity of the testator.

The will, upon the face of it, is a reasonable one. There is nothing in the disposition which the decedent makes of his

property that indicates an unsoundness of mind. With the exception of three small legacies, he gives his property to those who would have taken it by law if he had died intestate—his brother and sister—who are his only heirs-at-law and next of kin.

But it is said, that although the will bears upon its face no evidence of unsoundness of mind, yet in fact the disposition there made by the decedent of his property was in violation of an arrangement which he had made with his wife, since then deceased, under circumstances which would have induced him not to disregard it, had he possessed that soundness of mind which rendered him capable of intelligently disposing of his property.

The testator's wife, when he married her, was seized in her own right of a house in the borough of Bordentown. He agreed with his wife, that if she would unite in the proper conveyances, so as to vest the title of that property in him, he would, by his will, dispose of his property in a particular way specified. Such conveyances were made. On the twenty-first of December, 1840, the property of his wife was vested in the testator in his own right, and on the next day he made his will, in pursuance of the arrangement made with his wife. By that will, he gives to his wife, during her natural life, the income of all his estate, real and personal. He gives to the children of John L. McKnight, the children of Jacob K. Train, and Ellen Graham (who are alleged to be the cousins and heirs-at-law of testator's wife, but of which there is no proof,) the sum of $3000, to be divided equally among them, share and share alike. The said bequest last named to be void in case the testator's wife should leave issue by him, or by any future husband, and in such case such bequest to be for the benefit of such issue. The residue of his estate he gives to such persons as would by law have been entitled to his property had he died intestate.

By the will propounded for probate, the testator totally disregards the arrangement made with his wife, and which was recognized and carried out by the will of 1840, except

so far as relates to the children of John L. McKnight. Instead of the $3000 which he had given to the children of John L. McKnight, Jacob K. Train, and Ellen Graham, he gives one hundred dollars to each of the children of John L. McKnight, and makes no mention of Jacob K. Train's children or of Ellen Graham.

I think the change which appears to have taken place in the relative situation of the parties, and their respective circumstances between the years 1840 and 1853, sufficiently account for the different disposition of the testator's property, and his disregard of the arrangement which had been entered into between him and his wife, without attributing it to an unsoundness of intellect, which rendered him incapable of appreciating any moral or legal obligation he might be under to provide for the next of kin of his deceased wife.

His wife died within a year after the making of the first will. She left no issue. Thirteen years had passed since the execution of the will. John L. McKnight had, since then, inherited a fortune of upwards of $300,000, and one of his children had settled in a foreign land. The children of Jacob K. Train were living in a distant state of the Union, if living at all; but no one of the witnesses seemed able to give any account of them or of the whereabouts of Ellen Graham. It is true a *caveat* had been filed in their behalf, by J. L. McKnight as their attorney, but no power of attorney was produced, and the fair presumption is, after what took place on the investigation, that there is no such power of attorney in existence. After the inquiry made for Ellen Graham and for the children of Jacob K. Train, it was the duty of those opposing this will to have given some evidence of their being still alive, and of the authority to appear for them, if they wished to attach any importance to the fact of their not being mentioned or provided for by the will.

Taking into consideration all these circumstances, I do not think any conclusion unfavorable to the capacity of the decedent can be drawn from his not providing for his wife's relatives by his last, as he had by his former will. The

legacy of a hundred dollars, each, to the children of Mr. McKnight, shows that the arrangement he had made with his wife was not obliterated from his memory.

Was the testator, when he executed the will of 1853, of that sound disposing mind and memory which the law regards as sufficient to render him competent to dispose of his property by will?

On the 27th of October, 1841, the decedent was declared a lunatic by the Court of Chancery upon the usual proceedings had for that purpose in the court. Nathan Satterthwait was appointed the guardian of his person and property. He was sent to a lunatic asylum at Frankford, in Pennsylvania, where he remained seven or eight years. He then resided with his guardian, until he left his dwelling, in a clandestine manner, on the 10th of November, 1851. On the 6th of June, 1851, he presented a petition to the Court of Chancery, setting forth the proceedings upon which he was declared a lunatic—that he was found a lunatic from disease produced by the excessive use of ardent spirits; that he had entirely ceased and abandoned the use of all spirituous liquors, and was restored to the full possession and enjoyment of his reason and understanding.

After a full investigation under the direction of the court, the inquisition of lunacy was vacated, and the decedent was restored to the full possession of his property.

On the first of November following, he purchased a farm of eighty-two acres, near Bordentown, for the sum of three thousand five hundred dollars; he stocked this farm, at a cost of nearly $500, and went to farming; he bought and sold for himself, and transacted all the ordinary business required in carrying on such a farm; he had very considerable money transactions with various individuals; he kept a bank account, deposited his money, and drew it out from time to time by checks; he kept memoranda books, in which he entered generally, in his own writing, moneys which he from time to time received, and took receipts for money paid out. The books are neatly kept, and the entries made correctly

and intelligently. All these transactions were almost of daily occurrence up to within a few days of his death, which occurred in June, 1853.

The will was executed in the presence of three subscribing witnesses. It was drawn up by a gentleman of intelligence, a resident of Burlington county, who had long been acquainted with the testator. Mr. Tindall, one of the witnesses, had but a short acquaintance with him. He had known him only two years, and within that period had worked for him, repairing his farm and fences. Mr. Atkinson, another subscribing witness, had known him for twenty years; and the other witness, Mr. Carman, had been acquainted with him all his life; they had been brought up as boys together. These witnesses all concur that there was not much said by the testator at the interview when the will was executed. He met them at the door of the house, and shook hands with them. After remaining a short time in the front room, the witnesses retired to a back room, leaving Mr. Biddle, the scrivener, Samuel Pancoast, the brother of testator, and testator in the room together. After some time the witnesses were recalled. Testator then took his seat at the table, and signed the will. He put his finger on the seal, and acknowledged it as his last will and testament, using this language—"throwing all wills a one side heretofore made by him, or purporting to have been made by him." After the execution he thanked the witnesses, and invited them to stay to dinner. There was then some general conversation, in which testator participated. He followed the witnesses out of the room when they left; he walked out with them in the yard, and talked about the shrubbery, and showed them his roses, and after about ten minutes' conversation in the yard they parted. The witnesses all concur in the opinion that he was competent, at the time, to make a will. There was nothing said or done by him, at the time, to indicate any want of capacity. His conversation was rational, and his conduct in all respects unexceptionable, and marked by no peculiarity.

Resting the case here, no one would doubt the capacity of the testator. His former aberration of mind had been occasioned by excessive indulgence in intoxicating liquor. It was not strange, that after abstaining from this indulgence for upwards of ten years, and being perfectly restored to bodily health, there should be a restoration also of his mental faculties. It is true, in such a case we are not to expect the mind to reassume all its former vigor. The question is, as was said in *Towart* v. *Sellars*, 5 *Dow.* 231, whether he had recovered that *quantum* of disposing mind at the time of the execution of the writing which ought to give it effect.

But the caveators meet this case with an array of witnesses formidable both as to intelligence and numbers. I have examined all the evidence with great care, with a sincere desire that I might not err in my judgment of the case.

*Doct. Dewer* may be considered, I think, the most important witness for the caveators, and his judgment is entitled to great deference. He was acquainted with the testator for fifteen years, and attended him, as a physician, while he was with his guardian, and after his removal to his farm. The doctor states some facts, as evidences that he was not entirely of sound mind at all times during the last three years of his life. But the doctor does not say that, upon these facts, he formed an opinion that he was not competent to transact business, or had not capacity enough intelligently to dispose of his property. He details several conversations with him, and says that from them he was led to believe he was not *entirely* restored to his mind. The doctor shows that, in other interviews with him, he was perfectly rational, and remarks, that " it frequently happens that a person that has been thus afflicted is restored, so as to enable him to undertake all the ordinary relations and business of life and to manage his business affairs, and yet retain for a long time some peculiarity of thinking and acting on particular subjects." In concluding his testimony, the doctor says : " from the time I first knew Lewis Pancoast, I have known him to enjoy lucid intervals ; so far as I have conversed with him, I

have at times seen him so as he appeared perfectly sane; I mentioned two instances this morning; judging so far as I could see, I considered him to be perfectly competent to transact business—I refer to the whole time of my acquaintance with him; I have conversed with him when he appeared as rational as any person at times; during the last interview I had with him, and which was on his farm the spring before his death, he said or did nothing indicating insanity."

I place the utmost reliance upon the testimony of Doct. Dewer. The facts he states are undoubtedly correct, and his opinion from his facts commends itself to our judgment. If his estimate of the testator's mind is correct, the validity of the will is not at all impaired by his testimony, if the evidence of the scrivener and of the subscribing witnesses establish the fact that the will was executed by the testator in a lucid interval. The doctor being perfectly satisfied that he had such intervals, his evidence corroborates the evidence in support of the will. The doctor does not mention a single instance of any interview with the testator, in a professional way, when he found him wandering in his mind. He specifies the number of conversations with him as only two or three, when he exhibited evidences of a disordered mind, and these were during the last year of his life. Now it is shown that, during the last year of his life, he indulged in the use of ardent spirits. This would produce the very state of mind which the doctor describes. On the day the will was executed there was nothing in the testator's conduct to indicate that he had been indulging in strong drink.

*Doct. Worthington's* testimony has but little bearing upon the question at issue. He speaks of the testator only when at the asylum. He never saw him after he left there. As to his opinion when he last saw him, that he never would be able to transact the ordinary business of life, it is proved erroneous by nearly every witness sworn.

*Doct. Longstreet* was acquainted with the testator from the year 1845. In the year 1851, immediately after he left his guardian's, the doctor visited him professionally, for the first

time, several days in succession. He continued his medical attendance upon him up to the time of his death. During the whole time he knew him, he declares he was an insane man. He says his mental powers were more impaired, if there was any change at all, after he was restored to his property; that he was not capable of attending to the ordinary business of life, could not keep a book of account, and was not capable of judging of the value of property generally. The doctor says he does not believe he understood who his kindred and relations in life were; that during the year 1853 he had not memory and understanding sufficient to dictate a will disposing of his property. The doctor says this defectiveness of mental power consisted in want of memory and in certain *delusions* under which he was laboring. He gives us no single instance in which a want of memory existed. The delusions under which he was laboring the doctor specifies to have been, that some twenty years previous he had fallen into a lime-kiln, and been severely burned and that a hostile feeling had existed between himself and his father and his brother and sister. These same facts are referred to by all the witnesses who give an opinion unfavorable to his soundness of mind. But were these in fact delusions? If any reliance is to be placed upon human testimony, the fact about the testator's having been burned by falling into a lime-kiln is proved beyond dispute. The fact of the testator's having been the owner of a lime-kiln, and for a number of years carrying on the business, is admitted. Three witnesses testify to having been present at the time of the accident. They not only state the fact, but detail the circumstances of the occurrence—how he was extricated—placed upon a settee, and carried to a store in the neighborhood, and thence to his own house—the day of the week it occurred—the persons present, and the physician who attended him. The story, as it is told, bears upon its face the impress of truth. The witnesses corroborate each other, and their characters for truth and veracity are not impeached. The testator carried the scars of the burn all

his life. They were seen by a number of witnesses. With the evidence before me, the fact of the occurrence cannot be doubted. The hostility, too, that the testator exhibited towards his father and his brother and sister is rationally accounted for. He had difficulties with his father and with his brother and sister. It is unnecessary to inquire who was in the right. It is sufficient for our purpose to know that friendly feelings did not exist between the parties. A conclusion that the testator was of unsound mind, because he was laboring under delusions in these particulars, is a conclusion drawn from false premises. They were not delusions. Doct. Longstreet's opinion, that he was not capable of attending to the ordinary business of life; that he had no appreciation of the value of property; did not understand who his kindred and relations in life were, and had not memory and understanding enough to dictate a will, are proved by facts to be entirely erroneous. He carried on his farm with judgment and economy—made improvements upon his farm —employed men to do the work—bought and sold property— paid out and received money—rented out property of which he was the owner, and collected the rents—kept books of account, and kept them neatly and intelligently. In all these various transactions there is no evidence of his committing any error in judgment, or of doing his business in a manner to betray any lack of memory, prudence, or understanding. A witness, who lived with him from the time he moved on the farm till his death, says that he attended to all his ordinary business without any assistance—that the bargains he made were reasonable. He never knew him to make a foolish bargain—that he directed all the improvements on his farm, and that they were judicious, and such as a reasonable man would have made. This witness says: "Mr. Pancoast spent his evenings at home with his family; he read the newspapers to me in the evenings; he spoke to me about the news of the day and the contents of the paper; he had books, and used to read them to me and my family." I will mention here a few facts, which are clearly established, to

show that Doct. Longstreet labored under a great mistake as to the capacity of the testator to transact the ordinary business of life, and as to his being so entirely destitute of memory. When his farm was taxed, he discovered that he was taxed erroneously, and that no deduction had been made on account of a mortgage upon his farm. He appeared before the commissioners of appeal, and explained the error, and it was corrected. The testator purchased of one individual seven hundred rails for his farm, and made the bargain himself. When a settlement was made, it was found that he had himself kept an account of the loads as they were delivered, and it was correct. He settled by paying $30 in cash, and giving his note for the balance. In July, 1852, he was called upon, in connection with one of his neighbors, to make an appraisement of an intestate's property at the request of the administrator. There was some difficulty in making the appraisement, in consequence of the character of the property. Mr. Pancoast gave his advice as to the mode of appraisement, which was followed. The appraisement was completed, and signed by the appraisers. One witness testifies that he was about purchasing a farm, and knowing that the title had passed through some of the ancestors of the testator, he applied to him for information, and asked him if he knew anything of the title. He replied that he did, and gave a general description of it, and the various conveyances; he stated the portion of it that had come from his grandfather, and named over some other persons that different portions of it had come from. The witness found the information correct.

I have adverted to but few of the numerous facts, to show that during the last two years of his life there were times when the testator had mind enough certainly to transact the ordinary business of life. They are certainly at variance with the opinion formed by Doct. Longstreet, that during the whole of this period the testator was a lunatic, and not enjoying lucid intervals.

I think it unnecessary to examine the evidence further in

detail. There was a large number of witnesses examined on both sides, and as is usually the case, one class has no doubt of the testator's capacity to make a will, while the other has just as little doubt of his incapacity. I have not deemed it worth while to count them, to see which class is the largest in number. We might as well decide the case by taking their weight as by their numbers. It is very clear, from the facts I have alluded to, that whatever may have been the general state of mind of testator, he certainly enjoyed lucid intervals, and at such times was perfectly competent to dispose of his property. This being the case, the inquiry is narrowed down to the point—whether, at the time he made the will in question, he was in the enjoyment of such lucid interval? To ascertain this, we must rely upon those who were present, and witnessed the transaction. If they state facts to show that at that time he possessed mind enough to render him competent, the will must be established, unless their testimony is in some way impeached.

I have already alluded to the testimony of the subscribing witnesses. There was another witness present, and that was the scrivener who drew the will. Before adverting to his testimony, however, I would remark, that there is evidence going to show that the testator, prior to the execution of the will, had frequently declared his intention to make a will, and for the very purpose of making the alteration he did make between this will and the will of 1840.

He told Mr. Ellis that he wished to obtain the old will out of the hands of Mr. McKnight—said that it was a wrong will, and that he had been too much influenced in making it, and asked Mr. Ellis if he would not call on Mr. McKnight and get it. He at the same time gave his reasons why he should not call on Mr. Cannon or Mr. Hutchinson to draw his will. He said the former would not do, because he had written the former will, and was one of the executors, and as for the latter gentleman, there was some little misunderstanding between them in regard to his rents.

He said to Mr. Shreve, very soon after his restoration to
2 o*

his property, that he had made a will before he went to the asylum, and that it was in the hands of Mr. McKnight; and he requested Mr. Shreve to call on Mr. McKnight and get it, with other papers of his in Mr. McKnight's possession. When Mr. Shreve gave him the reply of Mr. McKnight to his request, *that he had no papers of Mr. Pancoast,* he was excited, and declared with warmth that he had, and among them was the will, and that it was a will he had been forced to make. It was true that Mr. McKnight had some of his papers, and among them this will.

He spoke frequently to Mr. Bartlett about the will that was in Mr. McKnight's hands, and said he intended to make another will. He complained of Mr. McKnight's treatment to him, and said McKnight would not speak to him when he met him.

A week or two before the execution of the will he had a long conversation with his neighbor, Mr. Lawrence, about his affairs. He spoke of the will he had made, and said he had made it to please his wife, and that he should make another will, and gave some reason why he had not done it before.

There is another fact worthy of notice, and that is, we find the decedent prepared to be liberal to his brother Samuel. His feelings had entirely changed towards his brother. The great anxiety he manifested for him while sick—his attendance upon him during his illness—and the sympathy and kindness which he exhibited towards him, were sure indications of a radical change in his feelings. Besides that, these affections of the heart were the natural fruits of the new light that had dawned upon his intellect. Their moral and intellectual faculties were congenial.

Notwithstanding the very decidedly unfavorable opinions expressed by the witnesses for the *caveat* of the testator's mental capacities, with the numerous facts before us, a few of which only I have referred to, we are not surprised at the testimony of William Biddle, the scrivener who drew the will, confirming the opinions of the subscribing witnesses to

the will, that at the time of its execution the testator was of sufficiently sound mind, memory, and understanding to transact that important business.

*Mr. Biddle* had been acquainted with him for twenty-six or twenty-eight years, intimately the last few years of his life. Samuel Pancoast, the brother of decedent, called on the witness on the morning of the 10th of April, 1853, and told him his brother Lewis wished him to come to his house, and write his will. The witness and Samuel went out together to decedent's farm. He met them at the door, and invited them in. After some little conversation, the witness alluded to the occasion of his visit. He said he thought he would have his will written, and told his brother to tell witness to come out, if he saw him. The witness then goes on to say, " I remarked to him that I was not very well prepared to write his will, but if he would give me the heads of what he wanted wrote I would take it down; he then went and got some paper and ink, and as I was going to take them up, Samuel Pancoast got up out of his chair to leave the room. Lewis said, Samuel, don't go out. He dictated to me what he wanted in his will, and I took down as he dictated to me, except one paragraph; I read it over to him after I had taken it down, and he said, 1 want you to leave two or three lines blank—I may think of something else I have forgot; he then said, when can you have it ready, and bring it here; I said, almost any time, and I fixed the next Monday, which I think was the 17th of April, and he said, very well." The witness then goes on to state what took place at that interview after this business was through. There was nothing said or done by the testator that exhibited anything at variance with his soundness of mind. The witness then details what took place on the day the will was executed. He went there on the following Monday with the will, as he had promised. The testator, he says, met them at the door, and invited them in. After a few moments' conversation, the three gentlemen who were in attendance as subscribing witnesses went into another room. The

witness then says: "After they went, Lewis asked me if I had the will with me; I answered yes, and took it out of my pocket, and handed it to him; he read it over very carefully, or appeared to, and handed it back to me; I then asked him if it was all right; he said, yes, as far as it goes; there is one thing, says he, I want in that is not here; I then said, there is a vacancy left, as you wanted, to put anything in; it is the last item in the will; the sixth item was then put in at his house: 'I do revoke all former wills by me made, or purporting to have been made by me.' He gave me the words, which I inserted—I took them from his lips. After I wrote the sixth item, I asked him if there was anything further to write; he said no, except naming the executors; he did not name his executors the first day I was there. I then filled up the last item, and had it ready for execution; he then took the will out of my hand, and read it over again, and said it was all right, and told his brother Samuel to call the witnesses out of the other room; he then came up to the desk, in the presence of those witnesses and myself and Samuel, took up the pen, and wrote his name opposite the seal; put his finger on the seal, and acknowledged it to be his hand and seal, and his last will and testament." To the question, whether he considered the testator of sound mind, memory, and understanding at the time, he replied: I considered him to be so; I had not the least doubt about it either time I was there; if I had had a doubt about his testamentary capacity, I would not have drawn a will for him.

My conclusions, upon a review of the whole case, are these.

*First.* It appears beyond a doubt that the testator, after he was restored by the Court of Chancery to the possession and management of his property, had lucid intervals, in which he was perfectly competent to make a will. I do not mean to say, that at any period after he was restored to his property he was incompetent; but that, giving to the evidence of the caveators its greatest influence, it proves nothing more than that the testator was a lunatic with lucid intervals.

*Second.* The three subscribing witnesses to the will, and the scrivener who drew it, and was present at its execution, present, by their testimony, a body of facts, embracing the conversation, conduct, and particular acts of the testator, which, if their testimony is to be relied upon, establish clearly that this will was the product of the testator's mind alone—that he dictated it with intelligence—comprehended it in all its bearings—appreciated the ties of kindred, and understood the character and extent of the property disposed of.

*Third.* There is no evidence going to impeach the moral character or intelligence of these witnesses. There is no pretence that the insanity alleged was of that subtle character as to deceive or mislead them. The only evidence of any pertinent fact bearing upon the material time of inquiry as to the testator's mind is this : it is proved that about that time, and within a few days of the execution of the will, and for a succession of several weeks, large quantities of ardent spirits were purchased at the neighboring stores, and carried to the residence of the testator. But there is no pretence that he was under the influence of liquor on the day of the execution of the will, or had been indulging at all on that day in the use of it. The evidence, therefore, was only important as going to show the producing cause of *general* incapacity; and as I have already observed, that if any such general incapacity existed, the subject of it had lucid intervals, it leaves the evidence of the witnesses, as to the soundness of the testator's mind at the particular time the will was executed, unapproached.

*Fourth.* The testimony of the subscribing witnesses, as to the sanity of the testator, is strengthened by the facts, that the will is a reasonable one on the face of it, and that its contents correspond with the repeated declarations of the testator.

*Fifth.* In the examination of this case, the following consideration is entitled to some weight. By this will, the property mainly is given to the heirs-at-law and next of kin, who are satisfied with the will as it stands. There is no other

will propounded for probate. The caveators, if they claim as devisees or legatees under another will, should have propounded it for probate. No other will is offered for probate, and the presumption is that if this will is not established the decedent died intestate. If this is so, the caveators will derive no benefit from defeating this will, and the property of the decedent will go to the persons who are satisfied with the disposition made of it by the testator by the will in question.